The Fidelity Title and Trust Company, Administrator of George Gray, deceased, Appellant, *v.* Joseph Bell and William Palmer, Executors of the last will and testament of Isabella Bell, deceased, Thomas Mellon and Andrew W. Mellon.

*Partnership—Real estate—Personal property.*

Where a partnership agreement provides that real estate should be considered as partnership property, and after the death of one of the partners, the surviving partner sells the real estate in good faith and for a proper

price, and the administrator of the deceased partner with full knowledge of the sale and the terms and conditions of it, receives specifically a part of the purchase money as coming to the estate of his decedent, an administrator d. b. n. of the deceased partner will be estopped by the act of his predecessor.

*Practice, Supreme Court—Equity—Exceptions—Question raised in Supreme Court first.*

Where a master appointed to state an account between partners allows a claim for the services of one of them, and no exception is taken to the allowance before the master or in the court below, it is too late to raise the question in the Supreme Court for the first time.

Argued Nov. 4, 1898. Appeal, No. 79, Oct. T., 1898, by plaintiff, from decree of·C. P. No. 2, Allegheny Co., April T., 1896, No. 612, on bill in equity. Before GREEN, MCCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Bill in equity for an account, and that land should be decreed to be held in trust.

The facts appear by the opinion of EWING, P. J., which was as follows:

It seems from the evidence that as far back as 1860, and probably earlier, George Gray and Isabella Bell had engaged as partners in purchasing coal lands and mining coal on Saw Mill Run, in this county. They had no written articles of partnership, so far as appears, until. January 14, 1881, when a written agreement, with a supplement or explanation, dated February 17, 1881, was signed by the parties. At that time they were the owners by conveyances, either to one or the other of the partners individually, or to them jointly, and otherwise, of the numerous tracts of coal and rights of way set forth in plaintiff's bill. This written agreement was probably made in contemplation of the early death of George Gray. It provided that all the coal and coal lands now owned and held by said parties, whether purchased by them as tenants in common, as copartners, or in the individual names of either of them, including the Long, the Crummie and the Chess mines, together with all tunnels, etc., and all coal, all engines, all cars, tracks, switches, mules, and so on, in and about the coal mines or the property used to carry on the business, and also the stock in their store at Banksville, and the debts owing to the firm, shares in the

capital stock of the Point Bridge Company and the Pittsburg & Lake Erie Railroad, held and owned by the parties, either jointly or in their individual names, "shall be held, used and enjoyed by them, the said parties hereto, during the continuance of said copartnership, as personal property and assets, share and share alike, subject, however, to the payment by them, the said parties in equal shares and proportions, of all debts owing by them, or either of them for purchase money for said coal or coal lands and other property above mentioned, and of all debts now owing by the firm or hereafter may be contracted by them, in the carrying on of the said copartnership business." A clause in this agreement excepted certain property of Miss Bell from this agreement as not being included in the partnership property. The agreement also provided for the continuance of the partnership for a period of five years from the date of the death of either of the parties, or until such time as the survivor and executors should, in their discretion, close up the business and dispose of the assets; and the supplement explained and provided that the business, in case of the death of one, should be carried on by the survivor and controlled by the survivor alone, who was to account to the representatives of the deceased copartner, and the representatives of the deceased copartner should have free access to the books and accounts of the business.

George Gray died July 5, 1881, intestate, and Charles C. Montooth, Esq., was duly appointed administrator of the said decedent.

The business was carried on, during the five years succeeding the death of George Gray, it is alleged, with profit, although, whether with profit or loss, does not appear distinctly. The administrator of George Gray had access to the books, and it would seem that the debts of the firm existing at the time of the decease of George Gray had been paid off. The larger portion of the business of the firm was supplying coal to the local trade in and around Pittsburg, and, perhaps, in part, the river trade. What was known as the Chess mine had a tunnel through coal hill by which they supplied the rolling mills known as the Painter Mills and the Singer, Nimick & Co. Mills, which took together, it is said, about 30,000 bushels a day. The coal in the Chess mine was substantially exhausted when, along about 1885, natural gas was introduced into those

mills and took the place of the coal and cut off the market for it, and there does not appear to have been any considerable business done in the mine since, and it has been abandoned. The Crummie mine, also, is said to be exhausted and abandoned. Beginning with January 23, 1886, before the expiration of the five years, a disastrous fire occurred in the other mine, known as "the Long mine," which continued for some eight or ten months before it was extinguished, and the testimony in the case is that serious and irreparable damage was done to the mine, and that operations for a long time ceased.

In order to dispose of the property, it became necessary to put the mine into operation in some way, and Isabella Bell, the surviving partner, Mr. Montooth, the administrator of George Gray, and the children, heirs of George Gray, consulted and had different meetings, and finally concluded an agreement on February 4, 1886, or it was reduced to writing that day. The parties were all represented by counsel, and were all present except George Gray, who was represented by his attorney in fact, who was also an attorney at law. By that agreement it was provided that Isabella Bell should proceed to operate the works of the partnership for the benefit of all concerned, and subject to the demands of the trade, changes in the market and avails of the partnership, should continue to operate the same until some other organization was made, the right being reserved to the administrator of the decedent's estate to examine the property by himself or his agents, inspect the management of the business, and so on, and for dividing any surplus that might arise.

The business was run under that agreement, until May, 1888, when Isabella Bell, as surviving partner, ceased to operate the mine directly, and attempts were made to dispose of and to have it operated by others.

In 1884, Isabella Bell, the surviving partner, and Martin C. Gray, one of the four children of George Gray, who was also manager and engineer in the mine, entered into a contract with the Hon. Thomas Mellon to purchase from him about 190 acres of coal adjoining the workings of the Gray & Bell coal in the Long mine, at the price of $450 an acre, to be paid in ten annual instalments, with interest from date, afterwards reduced to three per cent. As said, this adjoined the coal which

Gray & Bell were then mining, and the evidence, is, also, that Gray & Bell had trespassed on this coal, how much and to what extent does not appear, but to the extent of several acres.

The precise time at which they began mining in this Mellon purchase does not appear; but, before the fire, they had mined out over twenty-nine acres, and this coal had been run with and as a part of the coal of the firm. After the fire, and after the agreement of November 4, 1886, almost the entire output of coal was from this Mellon tract and it was, at the time of that agreement, known to all the parties to it, and understood that the coal would be so mined from the Mellon tract. There had been, in all, paid to Mellon some $21,500, including interest, and this appeared on the books of the firm.

On June 3, 1889, an agreement was entered into, by which the works were leased for one year to Gregg & Wildman to operate. They were to pay a royalty of twelve cents per ton, eight cents of which was to be paid directly to Mellon, and to be credited by him on his sale, and the other four cents a ton to be paid Gray & Bell directly. Some repairs had to be made, and certain of these repairs were to come out of the four cents per ton. Mr. Montooth, administrator of George Gray, knew of this lease and approved it, as did the heirs of George Gray. Gregg & Wildman operated the mines under this agreement, and the coal mined by them was wholly mined from the Mellon purchase, and it was understood and known that it would be so mined. This lease did not prove profitable to any of the parties. The testimony is that the mine was run at a loss, and that Gray & Bell realized not more than would pay the rentals that they were under.

On July 25, 1890, Isabella Bell, as surviving partner, conveyed to A. W. Mellon these coal works, including the wagons, tipples, and so on, and all the property of Gray & Bell therein, for a consideration of $8,000, paid in cash, and a release of the balance of the purchase money owing to Thomas Mellon on the purchase of 190 acres, made in 1884, which amounted at that time to about $85,000. After the purchase by Mellon, he leased to E. N. Wildman on a royalty to be paid, varying from eight cents down to five, depending on where the coal should be taken from; and Mellon has expended a large amount of

money in fitting up the mine and in various expenses, to put it in fair running order.

The gravamen of the complaint in this case is in relation to this sale to Mellon and the purchase by him. We may consider, in this case, A. W. Mellon and Thomas Mellon as one. No objection is made to that conclusion. It is charged in the bill and virtually admitted.

It is alleged that the property of the firm of Gray & Bell was entirely separate from that of the purchase from Mellon, and that it was worth a large amount beyond the $8,000 realized, and the bill seeks to hold Mellon as a trustee for the firm.

The situation in 1890, when Mellon made this purchase, was essentially different from that in 1884, when Thomas Mellon sold this coal. In 1884 the coal business was fairly prosperous, especially the local trade. The introduction of natural gas, in 1885 and 1886, and its general use in the factories and dwelling houses of Pittsburg, destroyed the local trade in coal. It depreciated the value of coal property and the price of coal mining, and the price of coal. In addition to that, later, by a combination of the railroads, they made what is known as the forty-mile limit, giving the same rate of transportation to all points within forty miles of Pittsburg, which has depreciated the value of coal in the immediate vicinity of Pittsburg, and largely so. The testimony shows clearly that the plant of Gray & Bell was old, was dilapidated, was in very bad order, and, with the small profits in mining coal, was in such a condition that even the owner, without any royalty to pay, would be likely to lose money in running his coal, where a plant in good order might make a small profit. According to the testimony, there was at that time, to wit: 1890, in all these pits, probably eighty to ninety acres of coal, possibly a hundred, including the different ribs, stumps, and all the coal remaining in the pit, the larger portion of which, to wit: the pillars and stumps, the testimony shows, would not pay for taking out. There was, in what was known as the O'Brien tract, about fifty-six acres of solid coal unmined. It had been completely cut off from access to the entries by the fire, and it would require, to reach it, an expenditure of several thousand dollars. When reached, owing to its situation and the dip of the coal, it could not be mined without expensive drainage and a pumping engine to pump out

the water. The remaining part drains back on to other coal. It is also about a mile and three quarters from the pit mouth, and it would be an expensive haul at best. The testimony shows that this coal would not pay for the expenses of getting access to it and of drainage, to be taken out by the entries of the Long mine. Its value is simply that of so much coal in place adjoining other coal which, in time, may be mined by other owners, and then it will become valuable. There is about twelve acres of coal lying in another place. All the balance is stumps and pillars. Standing alone, at that time, without what is known as the Mellon coal, the Gray & Bell plant had but little value, except that of old scrap. On one of the tunnels, or one part of the passageway, they were paying $1,200 a year rent; the lease had only thirty days to run, and if it was allowed to expire, with the property remaining on it, that became forfeited to the owner. They were paying $300 a year for another leasehold, for a place to run a fanning machine for the mine. How much of the other property was leasehold, or an entry on mere sufferance, does not appear. It is testified to by Mr. Bird, who was concerned at that time for one of the heirs, and who knew of this sale, that he had been trying to get a purchaser, and he says that he had an offer of $35,000 for the Gray & Bell plant. He says that he gave that offer to Mr. Pier, who represented Miss Bell, or to Miss Bell, and that about the time that they sold to Mellon for $8,000. The purchasers are not produced. The paper is not produced. What the conditions of it were do not appear. I very gravely doubt whether any solvent party made any such offer for the Gray & Bell plant alone. I cannot conceive that so careful a man as Mr. Pier was known to be should ignore such an offer, if it were made. The weight of the evidence, and the large weight of evidence is, that at the time this purchase was made, throwing out of view altogether the Mellon coal, the price paid by A. W. Mellon, in cash, was the value of the plant.

There is another feature in this case. When the purchase of coal was made by Isabella Bell and Martin C. Gray, who were operating this mine for the firm, as has been stated, it had been trespassed on by the firm, whether knowingly or unknowingly does not appear, and they were liable for it. The coal accessible to or owned by Gray & Bell was rapidly approach-

ing exhaustion. If this plant was to be made valuable, and available to sell in the future, either at the expiration of the five years or thereafter, or before, it was very important that the firm should have more coal adjoining, and the Mellon coal adjoined, and was readily worked from the Gray & Bell mines. If the purchase had been made by Gray & Bell before Gray's death, or under the same circumstances, of the then price of coal—the then condition of the coal business—it would have been considered a very judicious and desirable purchase. There is no doubt, I think, that they, having purchased from Mellon under the circumstances, and in the position which they occupied, could be held as trustees for the representative of George Gray and the firm. The representative might have repudiated or affirmed it. That they knew of the purchase is certain; that the heirs of George Gray, who were men of middle age, knew of it, is also certain; that the firm of Gray & Bell had mined from this, after the purchase and before the fire was known to both the administrator and these heirs. When the lease was made to Gregg & Wildman, that it was intended that the coal mined by them should be taken from this Mellon property is also certain, and all the parties knew it. It may be questionable whether or not the heirs of Gray are bound by their apparent acquiescence in the purchase. By 1890 coal lands had largely depreciated, and it was not worth the amount of the balance of the purchase money. The interest had not been paid and the indebtedness of $75,000 could not be paid by either Miss Bell, or any of the Grays, or the administrator. They got rid of the obligation. If the indebtedness to Thomas Mellon and the $8,000 is paid, and you take the whole Gray & Bell plant, including as a part of it the Mellon property, much more was paid for it than its market value, and much more than it is worth to-day with some $10,000 worth of improvements. The administrator of George Gray knew of this sale, as did also the heirs of George Gray—knew at the time, or immediately thereafter, and probably before.

After paying some of the debts of Gray & Bell there was a distribution of the proceeds of this $8,000 received from A. W. Mellon, and on October 14, 1890, C. C. Montooth, administrator of George Gray, formally receipted for $2,500 specially out of this purchase money, knowing what it was, knowing the

price and knowing all about the matter. The paper itself, which Mr. Montooth, who was a very careful man and a good lawyer, signed, shows that, on October 27, 1892, $586.87 was paid out of this same fund to the estate of George Gray, and also directly to the heirs of George Gray; on September 22, 1894, $100 was paid to each of the heirs of George Gray, after paying attorney's fees and the bookkeeper for preparing the accounts. This was after the death of C. C. Montooth and before the administrator d. b. n. was appointed.

This bill was filed March 14, 1896. Up to that date, so far as appears, no complaint was ever made to Thomas Mellon or Andrew W. Mellon, with regard to this sale. William S. Pier, attorney for Miss Bell, who conducted these proceedings, died December 27, 1892. C. C. Montooth, administrator of George Gray, died July 4, 1893. Martin C. Gray died June 2, 1893. Isabella Bell died February 28, 1896.

There has been no final settlement of the partnership accounts and assets between the estate of George Gray and Isabella Bell. Different partial settlements appear to have been made. A cursory examination of the books and accounts shows that at the time of the death of George Gray in 1881, the firm was heavily in debt, and of the assets which appear on the books, a large amount of accounts were undoubtedly worthless. One large one, at least—and other minor accounts—we know, as a matter of notorious history, was against parties insolvent, and, if my recollection serves me right, dead before the death of George Gray; and yet that large account, amounting to some eight or nine thousand dollars, was carried on the books as a good asset up until a late day. I am satisfied, also, that assets carried in the inventory, such as the fixtures and machinery, were carried at cost, regardless of their value, and away beyond the actual value.

An examination of the books and papers indicates that of the $21,500 paid to Mellon on account of purchase money of coal, $10,000 had been agreed on and assessed as damages for the previous trespasses on the coal in the ground, but that when paid it was to be taken as a part of the purchase money of the coal sold.

### CONCLUSIONS OF LAW.

From the above finding of facts, it will be necessary that

there should be a decree for an accounting between the partners. In regard to the sale of property to Andrew W. Mellon, complained of in the bill, it is claimed on the part of the plaintiff that the surviving partner had no power to sell and convey title to real estate, although made personal property by the partnership articles; that as between the administrator and the heirs and other representatives of George Gray, after all partnership debts were paid, and after the partnership accounts were adjusted, settled and paid, the balance remaining for distribution would have to be treated as real estate, though under the partnership articles as between the partners and for all partnership purposes, the real estate was converted into personalty: Foster's Appeal, 74 Pa. 391. But we deem it unnecessary to pass on that question in the present controversy. The plaintiff is the administrator d. b. n. of George Gray. It takes the place of C. C. Montooth, the former administrator. If this real estate was freed from debts and partnership accounts and went to the heirs, the present plaintiff has not the title. A. W. Mellon can only be held to be a trustee for the title which he has, and the present plaintiff is estopped by the act of its predecessor, C. C. Montooth, who, as administrator, with full knowledge of the sale and the terms and the conditions, received specifically a part of the purchase money as coming to the estate of his decedent; and in regard to Mellon, we have found that the sale was fair. There is no sufficient evidence to justify a finding that there was any fraud, any collusion, any deceit practised, but, on the contrary, that the sale was made in good faith and, therefore, as to Thomas Mellon and A. W. Mellon, the bill should be dismissed, and as to the representatives of the partners there should be a decree for an account.

The court has not the time to go into a proper examination, and the matter should be referred to a master or referee to take the account, taking the testimony that has already been given in this case, so far as it bears on the question of accounts, and also taking other testimony that may be necessary to state the account. In stating the account, however, the master will consider as settled the question of the good faith and the validity of the sale of the property to A. W. Mellon. He will also, where there is evidence of settlement of particular transactions or of settlement up to any particular date, between the admin-

istrator of George Gray and Isabella Bell, treat that as conclusive as to that settlement.

On the face of the accounts, as presented to the court, there would apparently be a balance coming to the estate of Isabella Bell. Whether or not she is entitled to compensation for services charged, we have not the testimony to determine. This will be for the master.

A. C. Johnston, Esq., was appointed master to state an account, and reported as follows:

1. The firm of Gray & Bell, composed of George Gray and Isabella Bell, as partners, was for many years engaged in operating and mining coal, being the owners of several tracts of coal land in this county.

2. On January 4, 1881, supplemented by a paper dated February 17, 1881, they entered into an agreement in writing, whereby it was provided, among other things, for the continuance of the partnership business for a period of five years from the date of the death of either of the parties, or until such time as the survivor and executors should, in their discretion, close up the business and dispose of the assets. The business so carried on was to be conducted and controlled by the survivor alone, who was to account to the representatives of the deceased partner, and the said representative was to have free access to the books and accounts of the business.

3. George Gray died on July 10, 1881, and the business was carried on in pursuance of that agreement by Isabella Bell, the survivor, assisted by Martin Gray, one of the heirs of George Gray, deceased, with the knowledge of C. C. Montooth, administrator of George Gray, as well as of all the heirs of the latter.

4. On the expiration of the said period of five years, viz: July 10, 1886, the books of the concern were audited by J. C. Robinson and a detailed report of their condition, supplemented by a statement made by George W. Scott, the bookkeeper, was submitted to all the parties in interest on November 4, 1886, and the same was fully examined and ratified by them, and, so far as the testimony shows, remained unquestioned until after the death of Isabella Bell, in February, 1896.

5. From November 4, 1886, Isabella Bell, under an agree-

ment signed by all the parties, carried on the business until May 6, 1889, when the plant was leased to Gregg & Wildman, and was carried on by them, or by Wildman alone, until July 25, 1890, when the entire plant, including the unmined coal, was sold to A. W. Mellon for the sum of $8,000.

6. Although the assets in November, 1886, exceeded the liabilities in a sum aggregating $92,096.84, they were made up almost entirely of worthless book accounts and coal in mines, the working of which has become impracticable, and had depreciated to such an extent in value that the sale to Mellon for $8,000 was a full and fair consideration for the same.

7. The assets of the concern have been fully accounted for by Isabella Bell, and there is now due her from the estate of George Gray, deceased, as rent and salary, the sum of $2,263.31, with interest from August 11, 1894.

### CONCLUSIONS OF LAW.

The views taken by the court in this case have withdrawn from the consideration of the master substantially all the legal questions involved, and he has endeavored to keep strictly within the suggestions of the court in respect to his conduct of the case. The plaintiff's counsel sought to introduce testimony bearing upon questions which the master considered had been passed upon by the court, and in such instances objections to such testimony were, for the most part, sustained. If this was error, plaintiff can correct the same on exceptions. In the view I have taken of this case, there seems to be but one question that requires consideration, and that is the claim of Isabella Bell for salary. It is not denied that she was entitled to a salary from November 4, 1886, but it is urged that prior to that time she was not entitled to any compensation, and that her estate should account to the plaintiff for the money she withdrew from the firm on that account during the years from July 10, 1881, to July 10, 1886. I am of the opinion, however, that under the agreement of January and February, 1881, referred to, although the matter of salary or compensation was not specifically provided for, if she carried on and managed the business, giving it her time and attention, as against the estate of her deceased partner, which rendered no services to the business, she would in equity be entitled to some compensation beyond

her share in the profits of the business, but whether that is so or not, the fact is clear that she claimed and from time to time collected her salary. That she was doing so was known to and acquiesced in by the administrator of George Gray, and probably to some of his heirs at the time, and was certainly made known to all the parties interested on November 4, 1886. There is no testimony to show that any objection or protest was made to this claim by any one, and it was not until after her death, and the lapse of more than ten years, that the question is first raised. In view of the circumstances, as shown by the testimony, the master is firmly and clearly of the opinion that it is now too late to go into that question, and that the present plaintiff is concluded by the acts of its predecessor, acquiesced in as they were by all the parties in interest. So far as the testimony in this case shows, Isabella Bell, on May 6, 1889, ceased to actively conduct this business, having leased the plant to Gregg & Wildman, who operated it until July 25, 1890, when it was sold to A. W. Mellon. Mr. Montooth, the administrator of George Gray, deceased, survived until July, 1893, and it must be assumed that he had full knowledge of the business from the date of his appointment down to the date of his death, and there is no evidence that he at any time raised any question as to the claim of Isabella Bell, or any other question affecting the business or its management. In view of these facts it would seem to be inequitable to impose the costs of this proceeding upon the defendant, especially when it has been found that there is a balance due her estate.

The master is, therefore, of the opinion, and finds that there is a balance due the estate of Isabella Bell, deceased, from the estate of George Gray, deceased, of $2,263.21, with interest from August 11, 1894, for which he recommends a decree, with the costs of this proceeding.

The court dismissed exceptions to the master's report and entered the decree recommended by him.

*Error assigned* among others was decree of the court, confirming the master's report.

*Joseph Hays*, with him *J. S. Ferguson* and *W. L. Bird*, for appellant, cited on the question of the power to sell: Parker v.

Broadbent, 134 Pa. 322; Foster's App., 74 Pa. 391; Murphy v. Hubert, 7 Pa. 423; Anderson v. Tompkins, 1 Brock. 457; Tapley v. Butterfield, 1 Metc. (Mass.) 515; Todd v. Lorah, 75 Pa. 156; Noble v. McClintock, 2 W. & S. 152; Tanner v. Hall, 1 Pa. 417; Purdy v. Powers, 6 Pa. 494; Hartley v. White, 94 Pa. 36; Brown's App., 89 Pa. 147; Leaf's App., 105 Pa. 513; Jones's App., 70 Pa. 170.

On the question of salary of survivor continuing business · Lindsey v. Stranahan, 129 Pa. 639; Gyger's App., 62 Pa. 73; Marsh's App., 69 Pa. 33; Beatty v. Wray, 19 Pa. 516 Brown v. McFarland, 41 Pa. 129.

*Willis F. McCook*, for appellees, Thomas Mellon and Andrew W. Mellon, cited Foster's App., 74 Pa. 391; Leaf's App., 105 Pa. 513; Kenyon v. Stewart, 44 Pa. 179.

*C. S. Fetterman*, for appellees, Joseph Bell and William Palmer, executors of Isabella Bell, deceased.

Per Curiam, November 14, 1898:

An examination of the testimony in this case convinces us that the findings of fact contained in the opinion of the court were fully justified by the evidence. We find no error in the conclusions of law made by the master, and are clearly of opinion that the decree of the court should be sustained upon the facts found by the court and the conclusions of law expressed in the master's report. We do not think there was any error in the rulings of the master upon the questions of evidence submitted to him and, hence, we cannot sustain any of the errors assigned. The question of Miss Bell's salary was raised too late. On its merits her claim to salary was so plainly just that no question was raised about it, but it was acquiesced in for many years. It does not appear that any exception on this account was taken before the master or in the court below, and it is too late to raise it here for the first time.

Decree affirmed and appeal dismissed at the cost of the appellant.